**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION**

CAROL HELMS,                 )
                               )
              **Plaintiff,**     )
                               )
vs.                            )     **Case No. 09-6081-CV-SJ-GAF**
                               )
PRIME TANNING CORP., et al.,   )
                               )
             **Defendants.**    )

## ORDER

Presently before the Court is Defendant National Beef Leathers, LLC's ("NBL") Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56. (Doc. # 39). NBL argues that it is entitled to summary judgment on all issues in this case because (1) Plaintiff Carol Helms ("Plaintiff") cannot establish that NBL's conduct caused or significantly contributed to her injury or damages and (2) Missouri law bars NBL from being held liable for Defendants Prime Tanning Corp.'s, a Missouri corporation ("Missouri Prime"), and Prime Tanning Co., Inc.'s, a Maine corporation ("Maine Prime") (collectively "Prime"), conduct prior to NBL's purchase of Missouri Prime's assets. *Id.* Plaintiff opposes, alleging NBL is continuing to cause her injury and can be held liable for Prime's conduct, as well as Defendant Wismo Chemical Corp.'s ("Wismo") conduct. (Doc. # 99). Upon thorough review of the materials presented to the Court and for the following reasons, NBL's Motion is **DENIED** in part and **GRANTED** in part.

## DISCUSSION

## I.     Facts

1

The present class action lawsuit arises from injuries, damages, and losses allegedly suffered by Plaintiff and potential class members as a result of exposure to hexavalent chromium and other toxic chemicals released from a leather tanning facility located at 205 Florence Road in St. Joseph, Missouri (the "Tannery"). (Second Amended Class Action Petition - Medical Monitoring ("Petition"), ¶ 1). Plaintiff alleges Prime and NBL applied thousands of tons of "sludge" containing hexavalent chromium to Missouri farmland in Andrew, Buchanan, DeKalb, and Clinton Counties as fertilizer from 1983 through early 2009. *Id.* at ¶¶ 11-13, 20. Plaintiff further alleges the chromium conversion and/or recovery systems designed by Defendant Burns & McDonnell Engineering Company, Inc. ("Burns & McDonnell") and operated by Prime, Wismo, and Defendant Elementis LTP, L.P. ("Elementis") failed to convert hexavalent chromium, a cancer-causing agent, into trivalent chromium. *Id.* at ¶¶ 14-15, 18.

## A.    *The Relevant Parties to the Pending Motion*

Missouri Prime is a wholly owned subsidiary of Maine Prime.[1] (Petition, ¶ 3). Prior to March 9, 2009, Missouri Prime owned and operated the Tannery and manufactured both bovine wet blue hides ("bovine hides") and porcine wet blue hides ("porcine hides") there. (Second Affidavit of Robert Hein ("Hein Aff. (2)"), ¶ 3). As a by-product of its tanning process, Missouri Prime produced sludge, which was used as a fertilizer on Missouri farmland. (Petition, ¶ 13).

NBL is a wholly owned subsidiary of National Beef Packing Company LLC ("NBPC"). (McGee Depo., 47:18-20). On March 9, 2009, NBL purchased the Tannery from Missouri Prime. (Second Affidavit of Simon McGee ("McGee Aff. (2)"), ¶ 4). At the Tannery, NBL processes bovine

---

[1]A third "Prime" company, Prime Tanning Company, Inc., a Delaware corporation ("Delaware Prime") guaranteed the sale of the Tannery in NBL's favor. (APA, Sec. 8.2).

hides that are owned, marketed, and sold by NBPC. (McGee Depo., 65:4-9). Like Missouri Prime, NBL also produces sludge as a by-product of its tanning process. (Petition, ¶ 13).

Missouri Prime, Maine Prime, or Delaware Prime has never owned or controlled NBL in anyway. (McGee Aff. (2), ¶ 10). The converse is also true; NBL has never owned or controlled in anyway Missouri Prime, Maine Prime, or Delaware Prime. *Id.*

Wismo was a company that converted hexavalent chromium to trivalent chromium, which was then sold to Missouri Prime for use in the tanning process. (McGee Depo., 76:11-17). Prior to March 9, 2009, Missouri Prime and Elementis, a chemical supplier that provided hexavalent chromium to Missouri Prime and trivalent chromium to NBL, each owned a fifty percent share of Wismo. (McGee Depo., 75:2-4; Hein Depo., 77:19-21, 78:6-10). On that date, Elementis sold its interest in Wismo to Missouri Prime. (McGee Depo., 195:4-10). Wismo was administratively dissolved on September 2, 2009. (Mo. Sec. of State Administrative Dissolution).

## B.    *The Purchase Agreement*

On February 23, 2009, Missouri Prime and NBL entered into an Asset Purchase Agreement (the "APA") setting forth terms and conditions under which: (a) NBL would purchase the Tannery and certain related assets and obtain Missouri Prime's rights under certain specified operating leases and contracts; and (b) NBL would assume certain specified liability in connection with the purchase. (McGee Aff. (2), ¶ 3; APA). The APA provided that, at closing, NBL would purchase all of Missouri Prime's "Assets" except for the "Retained Assets," which would stay with Missouri Prime. (APA, Sec. 1.1). The parties defined "Assets" as:

> [A]ll of the assets used or useful in the operation of the Business, including without limitation, the tangible personal property identified in <u>Schedule 1.1</u>, the Owned Real Estate, the machinery and equipment owned by [Missouri Prime] and used or useful in the Business, all permits and approvals issued to or held by [Missouri Prime] and

used or useful in connection with the Business, to the extent assignable, the Assigned Contracts, the Assigned Leases, the Wismo Assets, all Business records, and the Seller Intellectual Property. The parties hereto intend that the Assets include all of the assets of [Missouri Prime] of every nature and type apart from the Retained Assets and will allow [NBL] to operate the Business. All warranties, guaranties, rebates, credits, deposits, or other contract rights which [Missouri Prime] holds in connection with any transferred asset shall be included in the Assets transferred to [NBL].

*Id.* at Sec. 8.2. The term "Retained Assets" was defined as follows:

[T]he following assets of [Missouri Prime]: cash on hand, accounts receivable, insurance claims, hides or raw materials belonging to third parties and held by way of consignment or bailment, tax refunds, other refunds, equity interests in Wismo Chemical Corp., return premiums, shares of capital stock of [Missouri Prime] held in treasury, causes of action, hide inventories, work in process, finished goods, any rights to use the "Prime Tanning" name, including all registered and unregistered trademarks incorporating the "Prime Tanning" Name in accordance with Section 4.10 of this Agreement, all other trademarks and intellectual property of [Missouri Prime] other than the Seller Intellectual Property, all minute books, stock records, and corporate seals of [Missouri Prime], all personnel records and other records that [Missouri Prime] is required by law to retain in its possession . . . and all Contracts other than the Assigned Contracts and all leases other than the Assigned Leases.

*Id.* "Wismo Assets" meant "the machinery and equipment currently owned by [Wismo] located at [the Tannery] and set forth on <u>Schedule 8.2</u>." *Id.* <u>Schedule 8.2</u> reveals the Wismo Assets consisted mostly of tanks, pumps, and other equipment used for converting hexavalent chromium into trivalent chromium. *Id.* at Sch. 8.2.

Pursuant to the APA, NBL did not assume any obligation or liability of Missouri Prime, other than the "Assumed Liabilities." *Id.* at Sec. 1.4. The APA defined "Assumed Liabilities" as:

[P]ost-Closing Date obligations arising under the Assigned Leases and the Assigned Contracts and all accrued vacation time of those employees of [Missouri Prime] who are hired by [NBL], but excluding any other liability or obligations of [Missouri Prime], including, without limitation: (a) any liabilities arising from or related to the operation of the Business prior to the Closing (other than accrued vacation time as aforesaid); (b) any liabilities arising from or related to the historic use of the Owned Real Estate; and (c) any liabilities arising from or related to the environmental matters disclosed on <u>Schedule 2.14</u>.

*Id.* at Sec. 8.2.[2]  The term "Retained Liabilities" was defined as "all liabilities of [Missouri Prime] related to the Assets, the Business, or the historical operations at or in connection with the Owned Real Estate and not specifically contained within the Assumed Liabilities."  *Id.*

Additionally, the APA required Missouri Prime to terminate the employment of substantially all Tannery employees and required NBL to hire some, but not all, of those terminated employees. *Id.* at Sec. 4.8a.  NBL agreed to do so if those employees applied for positions with NBL, passed pre-employment medical and drug tests, and accepted NBL's offer of employment, including its terms and conditions.  *Id.*

The APA barred Missouri Prime from competing with NBL in the manufacturing, marketing, or sale of bovine hides in commercial quantities for a period of three years from the closing date.  *Id.* at Sec. 4.9.  Missouri Prime further agreed to cease the use of the "Prime" name in connection with any bovine hide business or business activities and to remove all references to the Tannery  and the bovine hide business at the Tannery from its internal and publicly available materials.[3]  *Id.* at 4.10.

Missouri Prime also represented that the sludge it had applied as fertilizer to Missouri farmland would not violate environmental laws or require remediation in the APA.  *Id.* at Sec. 2.14. Nevertheless, despite NBL's knowledge that Missouri Prime had converted hexavalent chromium

---

[2]By way of example, NBL assumed Missouri Prime's liabilities for the following contracts and leases: (a) lease agreement with GE Capital for forklifts; (b) the general services contract with Environmental Specialists, Inc.; (c) contract with Osborn Trucking; (d) the pest services agreement; (e) the fire sprinkler equipment inspection contract with Continental Fire Sprinkler Company; and (f) the uniform rental contract.  (McGee Depo., 110:10-25;  117:1-9*;*118:7-22; 119:1-4*;* 119:21-25; 120:1-9).

[3]While Missouri Prime is barred from using the "Prime" name in connection with any bovine hide business, it may use the name for other wet blue businesses, such as the porcine hide business.  (McGee Depo., 105:14-25, 106:16-107:1).

into trivalent chromium and had used hexavalent chromium as part of its tanning process, NBL did not undertake an independent analysis of the sludge to determine if Missouri Prime's representations were accurate, but instead relied on Missouri Prime's records that had been submitted to either the Missouri Department of Natural Resources ("MDNR") or the United States Department of Agriculture ("USDOA").[4] (McGee Depo., 24:1-4, 174:2-13; Hein Depo., 45:10-46:5). In any event, Missouri Prime had agreed to indemnify NBL and hold NBL harmless from and against certain claims or liabilities arising out of: (a) the ownership or operation of the Assets or Business prior to and including the closing date (other than the Assumed Liabilities); (b) a breach of Missouri Prime's representations or warranties; and (c) any Retained Asset or Retained Liability. (APA, Sec. 6.1a).

In addition to the assets purchased under the APA, NBL agreed to acquire Missouri Prime's inventory of chemicals that was on hand at the Tannery at the time of the closing. (McGee Depo., 94:9-18). One of the chemicals still on site on March 9, 2009, was hexavalent chromium, which was located in some storage tanks and later returned to Elementis. (Hein Depo., 46:18-47:14). NBL purchased the chemicals pursuant to a separate agreement from the APA and paid for them separately. (McGee Depo., 98:13-18).

---

[4]NBL requests the Court take judicial notice of certain content posted on the websites of the United States Environmental Protection Agency, Region 7 ("EPA") and the MDNR. (Doc. #113). These websites report the results of soil and water tests of locations near sludge land-application sites. While not entirely clear, it appears NBL requests the data reported on those websites be judicially noticed. The Court does not believe it is appropriate to take judicial notice of this data without further clarity of the request's scope and, therefore, **DENIES** NBL's request.

Nonetheless, these websites provide evidence that hexavalent chromium was present in farmland where sludge was land-applied. *See* Tannery Sludge Environmental Investigation, http://www.dnr.mo.gov/env/hwp/sw-sampling.htm#soilwatersampl#soilwatersampl (follow "May Sampling Results" hyperlink and "Farm Field Data Report" hyperlink), last visited May 10, 2010. The Court will use this information only to the extent it creates factual issues.

The APA closed on March 9, 2009, at approximately 1:00 p.m. C.T. (McGee Aff. (2), ¶ 4). NBL paid cash for the assets it acquired from Missouri Prime; there was no exchange of stock or other ownership interest between NBL and Missouri Prime. *Id.* at ¶ 5. At some point, NBL obtained a new federal tax identification number, one different from Missouri Prime. *Id.* at ¶ 9. Furthermore, nothing was provided to Wismo by NBL as consideration for conveyance of the Wismo Assets. (McGee Depo., 104:13-18). Since the closing, Missouri Prime has remained an existing business entity. (McGee Aff. (2), ¶ 8).

## C.     Post-Closing

### 1.     Personnel Matters

Before March 9, 2009, NBL had no role in operating the Tannery. (McGee Aff. (2), ¶ 15). Effective immediately upon closing, NBL began control and management of the Tannery through NBPC personnel, whose services are being provided to NBL pursuant to a services agreement between NBPC and NBL. *Id.* At all times since the closing, Robert Hein, NBPC's Senior Vic President - Hides, has had overall management responsibility for Tannery operations; Shaun Gleeson, NBPC's Technical Manager, has had direct management responsibility for the tanning operations at the Tannery; and William A. Ludwig, Jr., NBPC's Corporate Environmental Director, has had oversight responsibility for all environmental compliance and other environmental-related matters at and associated with the Tannery. *Id.* None of these persons have ever had any affiliation with Missouri Prime, Maine Prime, or Delaware Prime. *Id.*

Immediately before the closing, 87 hourly employees, 4 hourly management support employees, 20 salaried employees, 6 drivers, and 6 staff on active status were employed by Missouri Prime at the Tannery; and an additional 43 hourly employees were on long-term layoff status. (First

Affidavit of Paula Shackelford ("Shackelford Aff. (1)"), ¶ 6.a). Prior to the closing, those employees were notified of the NBL-Missouri Prime agreement for NBL to purchase the Tannery. (Affidavit of Michael Eckman ("Eckman Aff."), ¶ 3). NBL then provided those employees and persons never affiliated with the Tannery an opportunity to apply for employment in accordance with the procedure established by NBL. *Id*. This procedure involved a written employment application, a personal interview with an NBL representative, background checks, conditional offers of employment followed by medical examination and drug testing, and ultimately employment at the Tannery in accordance with NBL's determination of job assignments and classifications and all additional terms and conditions of employment. *Id*. Pursuant to Section 4.8a of the APA, Missouri Prime terminated the employment of all its Tannery employees at the time of the closing. (McKee Aff. (2), ¶ 14; McGee Depo., 188:7-190:16).

Of those who applied, NBL has hired 92 persons previously employed by Missouri Prime at the Tannery. (Shackelford Aff. (1), ¶ 6.b). Included in this number are five mid-level managers, Edwin Vice, Jim Pullen, Barbara Moore, Bill Weston, and Paula Shackelford, who remained in the same positions as those held when employed by Missouri Prime. (Hein Depo., .38:14-18, 39:6-12, 40:1-3, 40:17-41:6, 42:11-18, 53:23-54:2, 54:24-55:6, 58:17-23). However, no person who has ever served as an officer of NBL has ever served as an officer or director of Missouri Prime, Maine Prime, or Delaware Prime; and no person who at anytime has served as an officer or director of Missouri Prime, Maine Prime, or Delaware Prime has ever served as an officer of NBL. (McGee Aff. (2), ¶ 11).

After NBL took control of the Tannery, it materially changed many of the employee job descriptions and responsibilities; a number of persons hired by NBL who previously worked at the

Tannery when Missouri Prime owned and operated it have been assigned to different jobs and/or have different job responsibilities since NBL acquired the Tannery. (Eckman Aff., ¶ 4). The changes made to the CBA reflect this; the CBA dated April 1, 2006 (the "2006 CBA"), and the CBA dated May 1, 2009 (the "2009 CBA"), contain differences regarding the terms and conditions of employment at the Tannery, the organization and deployment of the work force, and management-labor relations. *Compare* 2006 CBA, Art. II *with* 2009 CBA, Art. IV; *compare* 2006 CBA, Exs. A and A(1) *with* 2009 CBA, Art. V; *compare* 2006 CBA, Arts. XXIII and XXVI and Exs. A, A(1), and I *with* 2009 CBA, Arts. V, VII, X, XI, and XII.

      2.     *Production Matters*

Before acquiring the Tannery from Missouri Prime, NBL determined that the Tannery was then only capable of operating at less than 50% of its designed capacity and was not capable of producing wet blue hides at volumes and specifications acceptable to NBL. (First Affidavit of Robert Hein ("Hein Aff. (1)"), ¶ 4). As part of NBL's acquisition rationale, it intended to renovate the Tannery and replace most of the equipment, including the existing drums, so that the Tannery could satisfy NBL's specifications and attain production levels that are necessary for the Tannery to remain an economically viable business for NBL. *Id.* at ¶¶ 4-5, Hein Aff. (2), ¶ 5; McGee Depo., 148:3-5. The renovation project is expected to require 18 to 24 months to complete at a cost of approximately $20 million. (Hein Aff. (1), ¶¶ 5, 8). In connection with its planned renovation of the Tannery, NBL has placed orders for new equipment to be used in the renovated Tannery. *Id.* at ¶¶ 9-11; Hein Aff. (2), ¶ 5. NBL represents it has proceeded with its plans for renovation of the Tannery by beginning its initial phase of renovation-related demolition on April 19, 2010. (Third Affidavit of Robert Hein ("Hein Aff. (3)"), ¶¶ 5-6).

Since acquiring the Tannery, NBL has made the following changes to operations at the Tannery: (a) eliminated the porcine hide tanning operation; (b) replaced all previous suppliers of fresh and brine-cured bovine hides with a new supplier; (c) established different product specifications and marketing targets through the introduction of five new grades and three new weight ranges for the wet blue hides; (d) created a different customer base; (e) eliminated the in-house transportation department and trucking fleet; (f) obtained new vendors for packaging, maintenance, and spare parts; (g) initiated the process of changing many of the Tannery's chemical suppliers; (h) implemented a new computer network infrastructure, systems, and software, as well as a new enterprise resource planning system to track invoicing, purchasing, and production; and (i) replaced the security vendor and increased security staffing and quality. (Hein Aff. (2), ¶ 3). NBL further claims it has introduced proprietary tanning processes that involved numerous changes to the recipes, processing steps, and techniques as well as made substantial changes to chemical usages. *Id.* However, Plaintiff argues NBL's changes were minute and depend upon the vessel size, and that NBL continued to use Missouri Prime's recipe for a short period of time. (Hein Depo., 32:21-25, 33:7-19).[5] NBL concedes it has not made significant changes to the parts of the plant that matter in terms of capacity. (McGee Depo., 51:3-22). Additionally, in a March 5, 2009, letter to the director of the Missouri Agricultural Experiment Station, Mr. Ludwig stated that NBL "intends to continue with the same hide tanning and fertilizer production processes implemented by [Missouri Prime]." (3/5/2009 Letter).

---

[5]Tanning recipes must be tailored specifically for each plant due to environmental factors, such as temperature, humidity, size, and layout of the plant and equipment. (Hein Depo., 31:10-25).

NBL further represents it has eliminated on-site conversion of hexavalent chromium to trivalent chromium. (Hein Aff. (1), ¶ 16). Instead, NBL purchases trivalent chromium from Elementis, which is the same company from which Missouri Prime purchased its hexavalent chromium or sodium dichromate. (Hein Depo., 77:19-21; 78:6-10).

3.    *The Sludge*

Since acquiring the Tannery, NBL has only land-applied sludge to two sites at Gary Osborn's farm in northwestern DeKalb County (the "Osborn farm") and has not done so since April 22, 2009. (Affidavit of Edwin Vice ("Vice Aff."), ¶¶ 4-5). The "as the crow flies" distance from the Osborn Farm to Plaintiff's place of residence is some 51 miles.[6] Since April 23, 2009, NBL has disposed of the sludge at solid waste landfills authorized to accept that material. (Hein Aff. (2), ¶ 4).

It was NBL's intention to continue to apply the sludge to farmland indefinitely after purchasing the Tannery. (Hein Depo., 55:21-56:4). But, after receiving notice of the instant action, NBL stopped the land application because it wanted to be responsible. (Hein Depo., 56:16-18). After April 22, 2009, NBL implemented a procedure to test the sludge weekly. *Id.* at 58:1-7.

4.    *Other Matters*

Since the closing, NBL has replaced all signage at the Tannery and has undertaken an effort to replace all stationary, business cards, logos, and other indications of the identity of the owner and operator of the Tannery from "Prime Tanning" to "National Beef Leathers." *Id.* at ¶ 16. NBL has never directly, indirectly, or by implication indicated to the general public or any governmental

_____

[6]NBL asked the Court to take judicial notice of this fact (Doc. #44), which the Court does. *See* Fed. R. Evid. 201; *Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 429 n. 34 (M.D. Pa. 2003) (holding that a court can take judicial notice of distances disclosed on an internet mapping service).

agency that the Tannery has at anytime since March 9, 2009, been owned or operated by Missouri Prime or at anytime prior to March 9, 2009, been owned or operated by NBL. *Id.*

## II.  Standard

Pursuant to Fed. R. Civ. P. 56, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary will not be considered. *Id.* In the absence of a factual dispute relating to an essential element of a party's claims, the Court will proceed to determine whether that party is entitled to judgment as a matter of law. *See E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001). In determining whether summary judgment is appropriate, the Court views all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).

## III.  Analysis

### A.  *Post-Closing Liability*

Missouri courts have generally held that:

> if a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable, although his negligence was not the sole negligence or the sole proximate cause, and although his negligence, without such other independent, intervening cause, would not have produced the injury.

*Carlson v. K-Mart Corp.*, 979 S.W.2d 145, 147 (Mo. 1998) (en banc) (citations omitted).[7]  In tort cases, the plaintiff must prove that each defendant's conduct was an actual cause of the plaintiff's injury.  *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 113 (Mo. 2007) (en banc). Absent causation, summary judgment is appropriate. *Mothershead v. Greenbriar Country Club, Inc.*, 994 S.W.2d 80, 89 (Mo. Ct. App. 1999) (citing *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 14 (Mo. 1994) (en banc)).

In denying post-closing liability, NBL posits two arguments.  First, NBL argues that, because the case has not yet been certified as a class action, the Court can only consider Plaintiff's individual claims in determining whether to grant summary judgment in its favor.  NBL continues, stating it applied sludge to a site approximately 50 miles away from Plaintiff's residence and, therefore, could not be an actual cause of any of her individual injuries.   Second, NBL contends Plaintiff has produced no evidence supporting allegations that the sludge NBL land-applied contained hexavalent chromium at a level harmful to human beings.  Contrary to NBL's suggestions, both of these arguments fail.

While it is true that Plaintiff may be unable to prove she, as an individual, has been injured by NBL's post-closing activities, the same cannot be said regarding all possible class members. When the case is a potential class action, a district court may rule on a summary judgment motion prior to deciding whether to certify the class under proper circumstances. *Wright v. Schock*, 742 F.2d 541, 543-44 (9th Cir. 1984).  Where the basis for granting a motion is equally applicable to all

_____

[7]The parties agree Missouri substantive law governs the issues in this case. *See Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 248 (5th Cir. 2008) (finding cases before a district court pursuant to the Class Action Fairness Act of 2005 are based on diversity jurisdiction and, therefore, are governed by state substantive law).

potential class members, summary judgment is appropriate. *See id.*; *Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941 (7th Cir. 1995).

In regard to post-closing activity, NBL's purported ground for summary judgment is lack of actual causation. NBL bases its first argument that it could not have caused or contributed to Plaintiff's individual injury because the only location it land-applied the sludge is approximately 50 miles from her residence. This is not an instance where the ground for dismissal is equally applicable to all members of the class. Potential class members may live closer to the Osborn Farm and may have had a greater opportunity for exposure to the sludge applied by NBL from March 9, 2009, to April 22, 2009. Assuming the sludge contained harmful toxins, the Court cannot simply ignore those persons' potential claims for relief because they are not the named class representative.

Turning to NBL's second point, genuine factual issues remain, precluding summary judgment. Viewing the facts in a light most favorable to Plaintiff, NBL knew Missouri Prime used hexavalent chromium in its tanning process; NBL continued to use Missouri Prime's tanning "recipe" for a period of time after acquisition of the Tannery; NBL possessed hexavalent chromium at the Tannery for a period of time after the closing; NBL continued to produce sludge in the same manner as Missouri Prime; NBL relied on Missouri Prime's records regarding the sludge even though it evaluated other environmental matters with its own experts; NBL land-applied the sludge without testing it; and samples tested by environmental agencies have indicated the presence of hexavalent chromium. Taking these facts together, a reasonable jury could return a verdict in Plaintiff's favor and against NBL. Accordingly, NBL's Motion is **DENIED** as to it post-closing liability.

B.      *Successor Liability for Pre-Closing Conduct by Prime and Wismo*

"The general rule of law in Missouri and most other jurisdictions is that where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former." *Roper Elec. Co. v. Quality Castings, Inc.*, 60 S.W.3d 708, 711 (Mo. Ct. App. 2001) (citations omitted). However, four exceptions to this general rule exist. *Brockmann v. O'Neill*, 565 S.W.2d 796, 798 (Mo. Ct. App. 1978). Liability will be found where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the corporation; (3) the purchasing corporation is merely a continuation of the selling corporation; and (4) the transaction is entered into fraudulently in order to escape liability for such debts. *Id.* (citations omitted). Plaintiff alleges either the APA amounts to a *de facto* merger of NBL with Missouri Prime and Wismo or NBL is merely a continuation of Missouri Prime and Wismo.[8]

1.      *De Facto Merger*

When determining whether a transaction amounts to a *de facto* merger, Missouri law directs courts to consider the following elements:

(1) a continuation of management and personnel and general business operations;

(2) a continuity of shareholders resulting from the purchasing corporation paying for the assets with shares of its own stock so the selling corporation stockholders become a constituent part of the purchasing corporation;

(3) the seller corporation ceasing ordinary business operations and dissolving as soon as possible; and

_____

[8]Plaintiff also attempts to argue NBL assumed the liabilities of Wismo. She bases her argument on the faulty premise that, because NBL expressly disclaimed some of Missouri Prime's liabilities in the APA while the APA remained silent as to Wismo's liabilities, NBL must have assumed Wismo's liabilities. However, the absence of one thing does not necessarily equate to the presence of another. Without more, Plaintiff cannot overcome the presumption against finding successor liability based on the assumption exception.

(4) the purchasing corporation assuming those obligations necessary to continue normal, ordinary business operations.

*ARE Sikeston Ltd. v. Weslock Nat'l, Inc.*, 120 F.3d 820, 829 (8th Cir. 1997) (quoting *Harashe v. Flintkote Co.*, 848 S.W.2d 506, 509 (Mo. Ct. App. 1993)). "It is not necessary to find all the elements to find a *de facto* merger." *Harashe*, 848 S.W.2d at 509 (citation omitted). Here, even when viewing the facts in the light most favorable to Plaintiff, the evidence does not support a finding that the APA amounts to a merger between NBL and Missouri Prime or NBL and Wismo.

In the *ARE Sikeston* case, the Eighth Circuit found that, although the purchasing company continued one of the seller company's manufacturing operations and retained some of its employees and mid-level managers, there was no *de facto* merger because the purchasing company did not continue all manufacturing operations of the seller company, the purchasing company was run by a different set of directors and officers than the seller company, the purchasing company paid for the assets with cash rather than stocks, and the seller company did not immediately cease its ordinary business operations. *ARE Sikeston*, 120 F.3d at 829.

In contrast, the facts in *Harashe* led the court to reach an opposite result; a *de facto* merger occurred. In reaching the conclusion, the court considered the following facts determinative:

> The agreement was generally silent about most of the employees of Zonolite but did provide for the continuation of employment for the president for five years and for Grace to continue the general business operations. The assets were purchased by the issuance of stock of Grace which was given to Zonolite stockholders thereby making them shareholders of Grace. The agreement required Zonolite be dissolved as soon as possible. Zonolite was allowed to continue daily operations pending conclusion of the reorganization but was severely restricted in the decisions it could make without express permission of Grace. Grace assumed the obligations of Zonolite necessary to continue the ordinary business of Zonolite.

*Harashe*, 848 S.W.2d at 509.

16

Regarding NBL's purchase of Missouri Prime's assets, the facts more closely parallel the facts of the *ARE Sikeston* case as compared to the facts of the *Harashe* case. Like the purchasing company in *ARE Sikeston*, NBL retained much of the manufacturing workforce employed by Missouri Prime and some of its mid-level managers but there has been no cross-over between the directors and officers of the two companies. While NBL is continuing to produce bovine hides, it does not produce other types of wet blue hides, i.e. porcine hides, that Missouri Prime once produced. NBL paid for the Tannery with cash; no shares of stock were exchanged. Further, Missouri Prime continues as a corporate entity and has not dissolved to date. Although the non-compete agreement precludes Missouri Prime from entering the bovine hide market for a period of three years and restricts the use of the name "Prime" in relation to the bovine hide business, Missouri Prime's ordinary business operations have not ceased and Missouri Prime is not required to obtain NBL's permission when making decisions regarding daily operations. Finally, while NBL did assume some of Missouri Prime's business obligations, such as certain leases and contracts and employee's accrued vacation time, Missouri Prime retained many of its obligations, such as pre-closing debts. For these reasons, no *de facto* merger of NBL and Missouri Prime has occurred.

The same is also true of NBL's acquisition of Wismo's assets. No evidence has been provided indicating NBL hired any Wismo employees, including its managers. NBL did acquire Wismo's conversion equipment. However, there is no evidence that NBL has used this equipment or has converted hexavalent chromium into trivalent chromium; the evidence demonstrates NBL continued a portion of Missouri Prime's business but not Wismo's business. Again, NBL paid cash to Missouri Prime for the Wismo Assets. Wismo was administratively dissolved within months of

NBL's acquisition of the Wismo Assets. Nevertheless, nothing demonstrates NBL assumed any liabilities of Wismo. Weighing these facts, no merger of NBL and Wismo has occurred.

2. *Mere Continuation*

When determining whether a purchasing company is merely a continuation of a seller company, courts have weighed numerous factors, including: (1) whether there is a common identity of officers, directors, and stockholders; (2) the extent of the involvement of prior officers as consultants; (3) whether the incorporators of the successor also incorporated the predecessor; (4) whether the business operations are identical and whether the same products are manufactured; (5) whether the transferee uses the same trucks, equipment, labor force, supervisors, and name of the transferor; (6) whether notice has been given of the transfer to employees or customers; and (7) whether a new federal identification number was obtained. *See Roper*, 60 S.W.3d 708, 711-12 (citations omitted); *Chem. Design, Inc. v. Am. Standard, Inc.*, 847 S.W.2d 488, 493 (Mo. Ct. App. 1993). Although the first factor, whether there is a common identity of officers, directors, and stockholders, is not determinative in the mere continuation analysis, it is a "key" factor. *Flotte v. United Claims, Inc.*, 657 S.W.2d 387, 389 (Mo. Ct. App. 1983).

The overwhelming evidence presented in this case demonstrates NBL is not a continuation of Missouri Prime. There is no common identity of officers, directors, and stockholders between the two companies, and NBL did not retain any of Missouri Prime's former officers as consultants. NBL's incorporators are not the same persons as Missouri Prime's incorporators. Although both companies engaged in the wet blue hide business, NBL produces only bovine hides and does not manufacture porcine hides as Missouri Prime did.

While NBL did hire many of Missouri Prime's former employees, these employees were notified of the change in ownership, were required to go through an application process prior to employment with NBL, were subject to a renegotiated CBA, and, in many instances, were given different or additional job duties and/or job titles. Additionally, NBL removed all signage and reference to "Prime Tanning" on the Tannery itself and in business documents. Further, NBL is in the process of replacing much of the equipment used in the tanning process and has obtained a new federal identification number. Based on these facts, NBL is not a mere continuation of Missouri Prime.

Nor is NBL a mere continuation of Wismo. As described, *supra*, at Sec. III.B.1, the record is silent as to NBL continuing Wismo's business in any way. Because no exception to the presumption against successor liability exists in this case, NBL is not liable for pre-closing conduct by Missouri Prime or Wismo. NBL's Motion as to pre-closing liability is **GRANTED.**

## CONCLUSION

Genuine factual issues remain regarding whether NBL caused or significantly contributed to injuries sustained by potential class members after March 9, 2009. However, NBL is not liable for Prime's or Wismo's pre-March 9, 2009, conduct under a successor liability theory. NBL's Motion is accordingly **DENIED** in part and **GRANTED** in part.[9]

**IT IS SO ORDERED.**

s/ Gary A. Fenner
Gary A. Fenner, Judge
United States District Court

DATED: May 11, 2010

---

[9]NBL's request for oral argument is **DENIED** as moot.